DIETZ–BRITTON, Appellant and Cross–Appellee,

v.

SMYTHE, CRAMER COMPANY et al., Appellees and Cross–Appellants.

[Cite as *Dietz–Britton v. Smythe, Cramer Co.* (2000), 139 Ohio App.3d 337.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 76435 and 76455.

Decided Oct. 2, 2000.

338

340

*McDonald, Hopkins, Burke & Haber, Tyler L. Mathews* and *Thomas C. Schrader,* for appellant.

*Climaco, Lefkowitz, Peca, Wilcox & Garafoli* and *Jack D. Maistros,* for appellees.

---

JOHN T. PATTON, Judge.

Pursuant to the terms of a legal defense program, defendant Smythe, Cramer Company, a residential real estate company, undertook the legal defense of plaintiff Judith Dietz–Britton, one of its real estate agents who had been sued for fraud in connection with a real estate transaction. Shortly before the trial in that case, Smythe, Cramer told plaintiff it would not indemnify her if she were found liable for fraud, although it would continue her defense. Plaintiff retained her own counsel and subsequently lost a jury verdict in the fraud case. Smythe, Cramer refused to indemnify, so plaintiff brought this declaratory judgment action asking the court to find the legal defense program a form of insurance and find that Smythe, Cramer breached the terms of the insurance contract. The parties filed cross-motions for summary judgment. The court found the legal defense program to be a form of insurance but held that Smythe, Cramer had no duty to indemnify for fraud or dishonesty. Plaintiff appeals that finding. Smythe, Cramer appeals the court's finding that the legal defense program constitutes a form of insurance.

The underlying facts are based on a previous lawsuit and are largely undisputed. Plaintiff represented a home seller with property located atop a steep bank running down to the Chagrin River. An engineering report prepared at the direction of the seller contained damaging information about soil instability on the property, concluding that landslides would likely occur on the property and that the leach field for the septic system should be relocated. Plaintiff originally prepared a sales brochure disclosing the existence of the report, the seller's willingness to share the report, and a notation that "verbal comments [by the engineer] * * * were favorable." The home buyer, John Lamb, received a copy of this brochure during an open house. Lamb returned to the house one week later for a second viewing and obtained another brochure, but this brochure did not contain the statement concerning the owner's willingness to share the report. Lamb agreed on sales terms but was unable to obtain a copy of the engineering report before closing on the house.

Just one year after buying the house, a 1,500 square foot section of Lamb's property slid into the river, exposing a portion of the septic system. In October 1991, he brought suit against both plaintiff and Smythe, Cramer, alleging that they fraudulently concealed the contents of the engineering report. We will refer to this action as the "*Lamb* litigation."

At the time of the *Lamb* litigation, Smythe, Cramer ran a legal defense program for its realtors. Effective November 15, 1990, the program provided a defense and indemnity for claims against realtors occurring after that date. On November, 20, 1990, plaintiff rejected retroactive coverage under a rider that would have covered her for claims occurring from the date she first began working for Smythe, Cramer, some twenty years earlier. Because Lamb's claim arose in June 1990 (before the November 15, 1990 starting date of the legal defense program), plaintiff made an August 1993 request to the president of Smythe, Cramer, asking him to consider extending retroactive coverage to her in light of her many years with the company and her excellent sales record. After considering the matter, Smythe, Cramer agreed to extend coverage on the condition that plaintiff refund to it her entire commission earned on the sale of the Lamb house. Plaintiff returned over $4,000 to Smythe, Cramer. Smythe, Cramer retained counsel, who defended both it and plaintiff. At no time did Smythe, Cramer reserve its rights to coverage.

The court scheduled trial for February 1996. On December 13, 1995, Smythe, Cramer met with plaintiff and, while stressing that it would continue to represent her at the trial, told her it believed that Lamb's fraud allegations fell within an exclusion to the indemnity provisions of the legal defense program pertaining to "fraud, dishonesty, criminal acts, license law or ethics violations * * *." Smythe, Cramer memorialized the discussion at that meeting in a January 4, 1996 letter from its general counsel to plaintiff. The letter stated that the "primary purpose" of the December 13, 1995 meeting "was to discuss the internal issue of whether the claim would be 'covered' pursuant to Smythe, Cramer Co.'s Realtor Legal Defense Program." The letter went on to state that "these internal issues are still being reviewed by Senior Management and myself * * *." The letter concluded by noting that the "internal issues" were unrelated to Smythe, Cramer's legal representation, but that plaintiff "as an individual defendant * * * may wish and are entitled to retain independent legal counsel. If you do not retain counsel, Smythe, Cramer Co. will continue to provide you with representation * * *."

Plaintiff responded with her own letter in which she told Smythe, Cramer that she believed that "the primary negligence in this case was the mishandling by Smythe, Cramer personnel, rather than by any intentional act of my mine."

Smythe, Cramer responded to plaintiff on January 8, 1996, by pointing to evidence produced during discovery that suggested that plaintiff may not have been forthcoming with the facts when asking its president to extend coverage under the legal defense program. Smythe, Cramer claimed that it learned that plaintiff had possession of the engineering report prior to selling the house to

Lamb but did not mention that fact to its president when asking for retroactive coverage under the legal defense program. The letter also stated:

"In conclusion, the evidence gleaned through discovery demonstrates that you intentionally concealed the written report. Further, it appears that you engaged in a continued course of misrepresentation by personally altering the handouts. It is Smythe, Cramer Co.'s conclusion that these actions are fraudulent, dishonest, and a violation of Ohio Real Estate license law. These activities are not authorized or condoned in any way by Smythe, Cramer Co."

At that point, plaintiff retained her own counsel for trial. Trial commenced just four weeks later on February 6, 1996. A jury awarded Lamb damages of $150,000—$90,000 against plaintiff and $60,000 against Smythe, Cramer.

Plaintiff did not appeal the judgment against her. When Lamb sought to execute on the judgment, plaintiff contacted Smythe, Cramer and requested that it pay the judgment. When Smythe, Cramer refused, plaintiff satisfied the judgment and brought this action for a declaratory judgment seeking a determination of her rights under the legal defense program. Upon cross-motions for summary judgment, the court ultimately found for Smythe, Cramer on all claims.

## I

The primary issue in this case concerns the effect of Smythe, Cramer's reservation of its rights under the legal defense program and the timeliness of that reservation of rights. In framing the issue in these terms, we acknowledge, as the parties do, that there is no analogous reported law governing this issue, so general principles of contract law apply to the application of the legal defense program. See Appellee's Brief at 39. Because this is a matter concerning the construction of a written contract, we review the legal defense program as a matter of law. See *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus; *Inland Refuse Transfer Co. v. Browning–Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 15 OBR 448, 448–449, 474 N.E.2d 271, 272–273.

A potential conflict of interest exists when an insurer assumes control of a defense for an insured but also intends to challenge its duty to indemnify if the defense is unsuccessful. *Collins v. Grange Mut. Cas. Co.* (1997), 124 Ohio App.3d 574, 577, 706 N.E.2d 856. The insurer may undertake a defense on behalf of an insured yet protect its position by reserving its rights under the policy. A reservation of rights consists of "notice given by the insurer that it will defend the suit, but reserv[ing] all rights it has based on noncoverage under the policy." *Motorists Mut. Ins. Co. v. Trainor* (1973), 33 Ohio St.2d 41, 45, 62 O.O.2d 402, 404, 294 N.E.2d 874, 877.

■ An insurer's reservation of rights is important because insurers often find themselves in positions that might create a conflict of interest. In some circumstances, an insurer might believe that its insured's conduct constitutes excluded conduct under an insurance policy. Hence, it may be to the insurer's financial advantage to see that the conduct is excluded, thus precluding indemnification. This constitutes a potential (though not necessarily actual) conflict of interest. See *Collins v. Grange Mut. Cas. Co.*, 124 Ohio App.3d at 577, 706 N.E.2d at 858. Under such circumstances, the insurer is obligated to defend the action but reserve its rights to indemnification. This way, the client can make a knowing choice whether to proceed with representation and the possible conflict, or obtain independent counsel.

Section D of the legal defense program lists ten different exclusions. Subsection 1 of Section D excludes:

"Fraud, dishonesty, criminal acts, licence law or ethics violations, undisclosed dual agency, reckless, malicious or intentional wrongdoing whether by act, omission or inaction."

■ "Intentional deceit" as alleged in the *Lamb* complaint is a form of conduct that would fall within subsection 1 of Section D as either "fraud" or "intentional wrongdoing." On its face, the *Lamb* complaint alleged that plaintiff engaged in conduct that would be excludable under the legal defense program. The court found that Smythe, Cramer reserved its rights in a January 8, 1996 letter to plaintiff and we agree. That letter stated Smythe, Cramer's opinion that plaintiff's conduct had been "fraudulent and dishonest." This statement would put a reasonable person on notice that Smythe, Cramer was denying coverage.

Despite this reservation of rights, the question remains whether Smythe, Cramer reserved its rights in a timely manner.

■ "[A]n insurer may waive its defenses if it defends without notifying the insured of a reservation of rights." *Turner Liquidating Co. v. St. Paul Surplus Lines Ins. Co.* (1994), 93 Ohio App.3d 292, 297, 638 N.E.2d 174, 178; *Ins. Co. of N. Am. v. Travelers Ins. Co.* (1997), 118 Ohio App.3d 302, 692 N.E.2d 1028. If the reservation of rights comes so late that it prejudices the insured's ability to defend the matter, a court may find that the insurer has waived the reservations of rights. For example, in *Turner Liquidating Co. v. St. Paul Surplus Lines Ins. Co.*, the court held that "[p]roviding a defense for nearly one year without reserving * * * rights may give rise to a claim of estoppel * * *." *Turner Liquidating Co.*, 93 Ohio App.3d at 300, 638 N.E.2d at 180. Likewise, in *Collins v. Grange Mut. Cas. Co.*, the court of appeals held that a sixteen-month period constituted a waiver of a reservation of rights. *Collins*, 124 Ohio App.3d at 579, 706 N.E.2d at 859–860.

Over two years elapsed from the time that Smythe, Cramer undertook a defense in the case to when it reserved its rights. Smythe, Cramer says that the reason it waited so long to question coverage under the legal defense plan is that it learned during discovery that plaintiff had misrepresented certain facts when asking for extended coverage under the legal defense plan. Smythe, Cramer points to an affidavit in which appellant originally insisted that she had not seen a copy of the engineer's report and notes that plaintiff later recanted that statement in light of an affidavit by another potential buyer who swore that plaintiff had sent him a copy of the engineering report, thus proving that she did in fact have possession of the engineering report.

Plaintiff disputes this point, saying that her counsel at the time (who also represented Smythe, Cramer in the *Lamb* litigation) erroneously prepared for the *Lamb* litigation an affidavit, which plaintiff signed, in which plaintiff denied having a copy of the engineering report. Counsel later tried to retract that affidavit, telling the court that she "erroneously concluded that Ms. Dietz had never had a copy of the engineer's report."

Counsel's retraction does not explain why plaintiff signed the affidavit knowing that it contained inaccurate information, but we nonetheless note the dispute over plaintiff's possession of the engineer's report arose in June 1993, two and one-half years before Smythe, Cramer questioned coverage. The dispute over plaintiff's possession of the engineering report also occurred almost three months before she asked Smythe, Cramer's president to grant her extended coverage under the legal defense plan. At the time of plaintiff's request for extended coverage under the legal defense program, members of Smythe, Cramer management who participated in the decision to grant plaintiff extended coverage had received counsel's retraction of plaintiff's affidavit, so it had actual knowledge prior to granting extended coverage that plaintiff did have the engineer's report. Smythe, Cramer cannot now complain that its president lacked sufficient information to make an informed decision about granting extended coverage under the legal defense plan when his own lieutenants had that information and did not tell him.

In any event, we cannot accept Smythe, Cramer's argument that it needed to wait to determine whether the allegations of the complaint alleged conduct that would be excluded conduct under the legal defense program. Lamb's complaint alleged plaintiff engaged in "intentional deceit" by failing to advise him of the latent defects in the property. As we see it, an allegation of "intentional deceit" would arguably encompass both "fraud" or "intentional wrongdoing" as set forth in the exclusion to the legal defense program. This was sufficient notice to Smythe, Cramer that plaintiff's alleged "intentional deceit" might come within an exclusion in the legal defense program. Nevertheless, Smythe, Cramer under-

took plaintiff's defense without immediately reserving its rights under the legal defense program and did not reserve its rights even after it became clear that plaintiff's conduct as alleged in the *Lamb* complaint, if true, would be excluded from coverage.

█ Smythe, Cramer also argues that regardless whether it timely reserved its rights under the legal defense program, application of waiver and estoppel would expand coverage under the legal defense program, particularly since the jury in the *Lamb* litigation found plaintiff liable for fraud.

█ It is true as a general proposition that the doctrine of waiver cannot be used to expand coverage. *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 668, 597 N.E.2d 1096, 1103–1104, citing 16B Appleman, Insurance Law & Practice (1981) 579, Section 9090. However, in *Turner Liquidating Co.*, 93 Ohio App.3d at 299, 638 N.E.2d at 179, the court of appeals found the general rule unpersuasive in a case where a late reservation of rights occurred:

"An insurer should not be able to avoid liability under all circumstances in which it voluntarily relinquishes a known right or induces another into changing his position based upon reliance on the insurer's conduct when the insured is prejudiced by such reliance. In cases of the insurer's misrepresentation made at the policy's inception, the insured has been prohibited from procuring the coverage he desired. In cases where the insurer represents the insured without a reservation of rights, the insured may be prejudiced by the legal strategy adopted by the insurer. Absent a reservation of rights, the insurer should not be able to terminate its representation of the insured regardless of when it concludes it is not required to defend its insured. To ignore the actions of the insurer would be an 'unfortunate triumph of form over substance.' *Harr* [*v. Allstate Ins. Co.* (1969), 54 N.J. 287] at 307, [255 A.2d 208] at 219."

The same concerns apply here. Although Smythe, Cramer claimed that plaintiff had not been truthful at the time she requested retroactive coverage under the legal defense plan, the facts show that Smythe, Cramer had reason to know long before it rejected coverage that plaintiff may have misstated certain facts about her possession of the engineering report. Instead of taking prompt action to reserve its rights at the time, it waited until four weeks before trial—more than two years later—to reserve its rights. If Smythe, Cramer is "saddled with coverage it may not have intended or desired, it is of its own making." *Turner Liquidating Co. v. St. Paul Surplus Lines Ins. Co.*, 93 Ohio App.3d at 299, 638 N.E.2d at 179.

■ Finally, we must determine whether Smythe, Cramer's late reservation of rights caused plaintiff prejudice. 7C Appleman, Insurance Law and Practice (1979) 313–319, Section 4693, states:

"Factors that may result in prejudice include the loss of a favorable settlement opportunity, inability to produce all testimony existing in support of a case, inability to produce favorable witnesses, loss of benefit of any defense in law or fact through reliance upon the insurer's promise to defend, or withdrawal so near the time of trial that the insured is hampered in the preparation of its defense." (Footnote omitted.)

Whatever chance plaintiff had to control her own destiny in the *Lamb* litigation passed after Smythe, Cramer's delay in reserving its rights. Particularly troubling to us is evidence that in pretrial settlement discussions Lamb offered to settle his case against both Smythe, Cramer and plaintiff for $100,000. The jury ultimately awarded $150,000 in total damages against both plaintiff and Smythe, Cramer. Other evidence, which will be discussed shortly, was that counsel warned Smythe, Cramer against going to trial and that there was an exposure to punitive damages.[1] Because of the late date of the reservation of rights, plaintiff lost the opportunity to conduct meaningful settlement negotiations.

Smythe, Cramer argues that no prejudice has been shown because it did not abandon the defense—plaintiff chose to obtain her own counsel. This argument misses the point. Smythe, Cramer's failure to raise the coverage issue in a timely manner created a conflict of interest. As we have said, Smythe, Cramer's late reservation of rights created a situation where it could defend the *Lamb* action, but leave open the possibility that plaintiff's conduct could be shown as intentional, thus foreclosing coverage under the legal defense program. Under these circumstances, plaintiff did not make the choice to obtain independent counsel but rather had no choice but to obtain independent counsel in the face of this conflict of interest. So while it is factually true that Smythe, Cramer did not refuse provide plaintiff's defense, its late reservation of rights created a conflict of interest that left plaintiff no choice but to protect her own interests.

As we noted at the outset, the parties filed cross-motions for summary judgment, claiming their entitlement to judgment as a matter of law. We perceive no material facts in dispute. Smythe, Cramer's late attempt to reserve its rights to coverage waived its ability to assert that right. Moreover, Smythe, Cramer's delay in waiting until just one month before the scheduled trial date to

---

1. On direct appeal from the *Lamb* verdict, we reversed a portion of the trial court's order that refused to permit the jury to consider a claim of punitive damages against Smythe, Cramer and plaintiff. See *Lamb v. Carver* (May 15, 1997), Cuyahoga App. No. 70637, unreported, at 7-10, 1997 WL 253176.

disclaim coverage prejudiced plaintiff's ability to defend the matter. For these reasons, we find that the court erred by granting Smythe, Cramer summary judgment on the indemnification claim. We find, as a matter of law, that plaintiff was entitled to coverage under the legal defense plan as a consequence of Smythe, Cramer's failure to reserve its rights in a timely manner. The first assignment of error is sustained.

## II

The second assignment of error complains that the court erred by granting Smythe, Cramer summary judgment on plaintiff's bad faith claim. Plaintiff alleged that Smythe, Cramer's refusal to provide coverage and refusal "to settle the *Lamb* litigation so that the claim could have been structured to fall under the errors and omissions provisions of the Legal Defense Program" constituted bad faith. The court initially denied summary judgment on these claims but then granted them on reconsideration, apparently agreeing with Smythe, Cramer's view that the liability verdict against plaintiff in *Lamb* ruled out any finding of bad faith in refusing to extend coverage under the fraud/intentional conduct exclusion of the legal defense program.

An insurer has a duty to its insured to act in good faith in the handling and payment of an insured's claims. *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315, paragraph two of the syllabus. An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor. *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397, paragraph one of the syllabus.

Although listed as a single claim for relief in the complaint, plaintiff's bad faith claim rests on two different grounds. First, plaintiff alleged that Smythe, Cramer failed to reserve its rights in a timely manner despite knowledge that she may have engaged in excluded conduct. Second, plaintiff claimed that Smythe, Cramer acted in bad faith by failing to make a reasonable settlement.

Smythe, Cramer strenuously argues that it had no duty to reserve its rights because the Lamb complaint alleged that plaintiff engaged in fraud— intentional conduct that would be barred from coverage under the legal defense program. It maintains that a reservation of rights would have been a vain act, since Ohio public policy precludes insurance coverage for intentional torts. Since a reservation of rights would have been a vain act, it reasons that it cannot be liable for bad faith in denying a claim that is against public policy.

Smythe, Cramer correctly notes that it is against public policy to allow insurance coverage for intentional torts. See *Wedge Products, Inc. v.*

*Hartford Equity Sales* (1987), 31 Ohio St.3d 65, 67, 31 OBR 180, 181–182, 509 N.E.2d 74, 75–76. However, a claim of bad faith is a tort arising out of the contractual duty to defend in good faith. In *Motorists Mut. Ins. Co. v. Said* (1992), 63 Ohio St.3d 690, 694–695, 590 N.E.2d 1228, overruled on other grounds, *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397, paragraph one of the syllabus, the Ohio Supreme Court stated:

"At the outset, we recognize the well-established principle in Ohio that imposes on the insurer a duty to act in good faith in the handling and payment of the claims of its insured. *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315, paragraph one of the syllabus. Moreover, as we emphasized in *Hoskins,* '[a] breach of this duty will give rise to a cause of action in tort against the insurer.' *Id.* The tort of bad faith is not a tortuous breach of contract, for no matter how willful or malicious the breach, it is no tort to breach a contract. See *Ketcham v. Miller* (1922), 104 Ohio St. 372, 136 N.E. 145. Rather, the tort of bad faith arises as a consequence of a breach of a duty established by a particular contractual relationship. In the area of contracts of insurance, the legal duty of good faith imposed by law on the insurer applies with equal force to the company's settlement of third-party claims against its insured as it does to those claims brought by the insured himself. *Hoskins, supra,* 6 Ohio St.3d at 275–276, 6 OBR at 340, 452 N.E.2d at 1319." (Footnote omitted.)

 Even though it would be against public policy for the legal defense program to indemnify plaintiff for damages caused by her intentional conduct, Smythe, Cramer nonetheless had the duty to reserve its rights under the policy and protect its position. And when deciding to reserve its rights, it had the obligation to so in good faith, without causing undue prejudice to plaintiff's ability to make an informed decision to obtain independent counsel. The facts viewed in a light most favorable to plaintiff suggest that Smythe, Cramer had reason to know from the outset that Lamb's claims against plaintiff sounded in intentional tort. In fact, these same facts form the basis of the waiver and estoppel claims. While we express no opinion on the merits of this bad faith claim, we note the same evidence mustered in support of the waiver and estoppel issue bears on the resolution of this claim. We state only that reasonable minds could differ on the factual issue presented by the claim.

 We also find that the court erred by granting summary judgment on the second part of the bad faith claims—Smythe, Cramer's alleged refusal to settle the Lamb litigation.

 "It is settled law in this state that an insurer owes a duty to exercise good faith in defending and settling claims against the insured and that a breach of that duty will give rise to a cause of action by the insured." *Centennial Ins.*

*Co. v. Liberty Mut. Ins. Co.* (1980), 62 Ohio St.2d 221, 222, 16 O.O.3d 251, 252, 404 N.E.2d 759, 761, citing *Hart v. Republic Mut. Ins. Co.* (1949), 152 Ohio St. 185, 39 O.O. 465, 87 N.E.2d 347; *Slater v. Motorists Mut. Ins. Co.* (1962), 174 Ohio St. 148, 21 O.O.2d 420, 187 N.E.2d 45.

Plaintiff presented evidence to show that two months prior to trial, Smythe, Cramer had legal advice to "[s]ettle ASAP before Judy Dietz gets deposed." Settlement discussions were apparently ongoing, and the parties to the *Lamb* litigation were $18,000 apart, yet Smythe, Cramer wanted to "squeeze" another realtor to make up the difference. It took this stance, apparently, even though it knew that outside counsel had warned it not to go to trial.

Smythe, Cramer vigorously disputes plaintiff's allegations, pointing to affidavits from its counsel in the *Lamb* litigation that Lamb would not accept a settlement. We will discuss those affidavits in more detail in a later portion of this opinion. For present purposes the inconsistencies between counsels' affidavits and various statements quoted above are sufficiently dissimilar that reasonable minds could differ over their import. For this reason, we sustain the second assignment of error and remand for trial.

### III

The third assignment of error complains that the court erred by granting summary judgment on the promissory estoppel claim against Smythe, Cramer's president. That claim alleged that plaintiff justifiably relied on the president's representation that he and Smythe, Cramer would fully cover plaintiff under the legal defense fund. Plaintiff claims that the president's representation to her husband that "we always intended to represent Judy in this matter" constituted a guarantee of a legal defense.

Promissory estoppel is " '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' " *Talley v. Teamsters Local No. 377* (1976), 48 Ohio St.2d 142, 146, 2 O.O.3d 297, 299, 357 N.E.2d 44, 47, quoting and adopting Restatement of the Law, Contracts 2d (1973), Section 90. In order to prove a case of promissory estoppel under Ohio law, a plaintiff must demonstrate the following elements: (1) a promise, clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) reliance that is reasonable and foreseeable; and (4) injury caused by the reliance. *Weiper v. W.A. Hill & Assocs.* (1995), 104 Ohio App.3d 250, 260, 661 N.E.2d 796, 803.

The court did not err by granting summary judgment on the promissory estoppel claim because plaintiff cannot hold the president personally responsible for promises he made on behalf of Smythe, Cramer.

■ "An officer of a corporation is not personally liable on contracts * * * for which his corporate principal is liable, unless he intentionally or inadvertently binds himself as an individual." *Centennial Ins. Co. of New York v. Vic Tanny Internatl. of Toledo, Inc.* (1975), 46 Ohio App.2d 137, 142, 75 O.O.2d 115, 118, 346 N.E.2d 330, 334.

The evidence fails to show that the president's representations were made in an individual capacity, as opposed to his capacity as a corporate officer. Smythe, Cramer administered the legal defense program, not the president. Plaintiff submitted no evidence to show that he directly bound himself by any representations. In fact, the one piece of evidence plaintiff does point to, a letter from the president to her husband, belies her own argument. In that letter, the president wrote to plaintiff's husband, "[k]now that we always intended to represent Judy in this matter." The president's use of the first person plural pronoun "we" does not suggest individual action on his part but action on behalf of the corporate entity. For this reason, the court did not err by granting summary judgment on the promissory estoppel claim. The third assignment of error is overruled.

## IV

■ The first cross-assignment of error complains that the court erred by striking the affidavits of three attorneys who represented Smythe, Cramer and plaintiff in the *Lamb* litigation. Those affidavits, contained in Smythe, Cramer's motion for reconsideration of the court's initial ruling concerning plaintiff's bad faith claim, generally stated that the *Lamb* matter could not be settled prior to trial. Plaintiff asked the court to strike the affidavits because they contained client confidences relating to plaintiff's settlement posture, her defense strategy, and her "unwillingness" to meet Lamb's demands. The court struck the affidavits without opinion.

■ The court did not err by striking the affidavits. An attorney owes a client a duty of vigorous advocacy that a client has a right to expect will continue until the matter is completely resolved. *In re Corn Derivatives Antitrust Litigation* (C.A.3, 1984), 748 F.2d 157, 161. Moreover, "an attorney may not abandon his client and take an adverse position in the same case." *Id.* "As a matter of professional responsibility, an attorney owes a duty of loyalty to his client. This duty encompasses an obligation to defer to the client's wishes on major litigation decisions, not to divulge confidential communications from the client, and not to accept representation of a person whose interests are opposed

to those of the client." *In re Agent Orange Product Liab. Litigation* (C.A.2, 1986), 800 F.2d 14, 17–18.

 The duty not to take an interest adverse to a client is distinct from revealing client confidences. EC 4–5 of Canon 4 of the Code of Professional Responsibility states: "A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client, except with the consent of his client after full disclosure * * *." This obligation to protect a former client's interests is broader than the evidentiary privilege against divulging client confidences. See *Brennan's, Inc. v. Brennan's Restaurants, Inc.* (C.A.5, 1979), 590 F.2d 168, 172; *Sarbey v. Natl. City Bank, Akron* (1990), 66 Ohio App.3d 18, 27, 583 N.E.2d 392, 398–399. In fact, the use of the word "information" as opposed to "confidence" or "secret" "is particularly revealing of the drafters' intent to protect all knowledge acquired from a client, since the latter two are defined terms." *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d at 172.

All three affidavits were prepared by attorneys who, at one time or another, represented plaintiff's interests in the *Lamb* litigation. Attorneys Ballard and Coakley represented both plaintiff and Smythe, Cramer at the onset of the *Lamb* litigation. Attorney Jones took over plaintiff's defense after Smythe, Cramer denied coverage under the legal defense program. All three undoubtedly acquired "information" during their representation.

Attorney Coakley's affidavit stated he did not believe that a conflict of interest existed in Smythe, Cramer's representation of plaintiff and that he attempted to settle the *Lamb* litigation but was unable to do so. Attorney Ballard likewise averred that she believed that there was no conflict of interest present in her dual representation of plaintiff and Smythe, Cramer and that "settlement of the Lamb litigation, on any terms, was not a viable option for either Dietz or Smythe, Cramer Co. during the time Affiant represented Dietz."

Attorney Jones' affidavit went farther. His affidavit states:

"4. At no time during his representation of Dietz was Affiant made aware of: (a) any facts that would have supported a claim by Dietz against Smythe, Cramer Co. relating to the defense of the *Lamb* litigation; or (b) any separate claims, defenses or arguments that were not asserted by Dietz because of the fact that she was being represented by the same attorneys defending Smythe, Cramer, Co; and (c) Affiant's defense of Dietz in the *Lamb* litigation was consistent with the defense asserted by her previous counsel; and

"5. Affiant attempted to settle the *Lamb* litigation but could not do so because of Lamb's demands and Dietz' [*sic*] unwillingness to meet such demands. Affiant is aware of no facts to support the proposition that the *Lamb* litigation could have

been settled prior to Affiant's retention even if Dietz had separate counsel from Smythe, Cramer Co."

Because all three attorneys represented plaintiff at some point during the *Lamb* litigation, they owed to plaintiff a duty of loyalty that extended beyond their representation of her during the *Lamb* litigation. Coakley and Ballard are not actually involved as legal counsel in this current matter. Nor for that matter have they revealed any client confidences. Nonetheless, their prior representation of plaintiff, albeit in a joint capacity with Smythe, Cramer, means that they are not at liberty to take positions adverse to plaintiff once their representation ended.

Jones's affidavit is more direct. In it he states that he is aware of no facts that would support a finding of bad faith against Smythe, Cramer. This statement necessarily arises out of Jones's representation of plaintiff in the *Lamb* litigation and it might be considered adverse to her current interests.

Our discussion here is not meant to imply that any of the three attorneys engaged in improper or unethical conduct by swearing out three affidavits. The affidavits are abstract enough (for example, Coakley's statement that he was unable to settle the *Lamb* case) that it cannot be said that the statements contained therein were patently adverse to plaintiff's interests. Nonetheless, the court could reasonably, and out of an abundance of caution to plaintiff, find that the affidavits were potentially adverse to plaintiff's interests and strike them on that ground. The court did not abuse its discretion. The first cross-assignment of error is overruled.

## V

The second cross-assignment of error relates to the court's finding that Smythe, Cramer's legal defense program is "a form of insurance subject to interpretation to insurance case law." Smythe, Cramer argues that this was a gratuitous declaration by the court because it had no bearing on the applicable issues of law—Smythe, Cramer conceded that contract principles relating to insurance law would apply, so the court had no reason to make a declaration concerning the nature of the legal defense program.

In *Physicians Ins. Co. of Ohio v. Grandview Hosp. & Med. Ctr.* (1988), 44 Ohio App.3d 157, 542 N.E.2d 706, the court of appeals cited *Am. Nurses Assn. v. Passaic Gen. Hosp.* (1984), 192 N.J.Super. 486, 494–495, 471 A.2d 66, 70–71, affirmed (1984), 98 N.J. 83, 484 A.2d 670, for the following proposition:

"As a matter of common understanding, usage, and legal definition, an insurance contract denotes a policy issued by an authorized and licensed insurance company whose primary business it is to assume specific risks of loss of members

of the public at large in consideration of the payment of a premium. There are, however, other risk-shifting agreements which are not insurance contracts. These include the customary private indemnity agreement where affording the indemnity is not the primary business of the indemnitor and is not subject to governmental regulation but is merely ancillary to and in furtherance of some other independent transactional relationship between the indemnitor and the indemnitee. The indemnity is, thus, not the essence of the agreement creating the transactional relationship but is only one of its negotiated terms."

The court had virtually no evidence from which it could make a determination that the legal defense program constituted an insurance program. Although many parts of the legal defense program resemble an insurance program, there is no evidence to show that the legal defense program is the primary business of Smythe, Cramer, intended to "assume specific risks of loss of members of the public at large in consideration of paying a premium." There is also no evidence to show how Smythe, Cramer benefits from the legal defense program in a monetary fashion. In fact, the evidence tends to suggest that the legal defense program is more in the nature of a private indemnity agreement between Smythe, Cramer and its realtors than an insurance program. Our holding here is not a definitive ruling on the issue. We simply sustain the second cross-assignment of error on grounds that the court lacked sufficient evidence to find that the legal defense program constituted a form of insurance subject to regulation by the department of insurance.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

KARPINSKI, P.J., and TIMOTHY E. McMONAGLE, J., concur.