STICKOVICH et al.,

v.

CITY OF CLEVELAND, Appellee, et al.; Commercial
Union Insurance Company, Appellant.

[Cite as *Stickovich v. Cleveland* (2001), 143 Ohio App.3d 13.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 75655.

Decided Aug. 13, 2001.

14

*Robert J. Lally,* Assistant Director of Law, for appellee.

*Reid, Berry, Marshall & Wargo* and *Andrew M. Wargo,* for appellant.

———————————

KARPINSKI, Presiding Judge.

This appeal involves an insurance coverage dispute. Two employees of an independent contractor working on a public works bridge project were injured when the contractor directed its unlicensed crane operator—who had been drinking alcohol—to violate safety regulations and the crane touched a municipally owned electric power line. Although the contractor had named the municipality as an additional insured on its liability insurance contract, the insurer argued that its own liability insurance coverage violated public policy. We affirm the trial court's judgment, made by two successive judges, that the compulsory public liability insurance coverage does not violate public policy.

### Background and Facts

In 1990, Cleveland City Council passed ordinance No. 993–90 authorizing and directing Cleveland to accept public bids and enter into the challenged public works contracts. The project, declared by Cleveland City Council to be an emergency, was to demolish and reconstruct the Washington Avenue Bridge. Among the requirements for the project was compulsory liability insurance, a requirement on public works projects throughout the state. Columbus Codified Ordinances ("C.C.O.") 185.26.[1]

At the time of the bidding, various utility lines were located near the existing bridge: Cleveland Public Power ("CPP") maintained electric power lines beneath the bridge, and other utilities maintained power, telephone, and other utility lines on the north and south sides. The notice to bidders provided by Cleveland specifically informed them that the project was required to comply with certain safety regulations, including Ohio Adm. Code Section 4121:1–3–07, which governs the operation of cranes near power lines.

In June 1991, after reviewing the site and the work to be performed, Industrial Construction Company, Inc. ("ICC"), an independent contractor, submitted a bid to perform the project. Cleveland accepted ICC's bid and agreed to pay

———————————

**1.** C.C.O. Chapter 185 comprehensively governs responsibility for safety and insurance on such projects and includes the following sections: 185.18, "General Conditions of Public Improvement Contracts"; 185.19, "Contract Documents for Public Improvements"; 185.23, "Responsibility of Contractor"; 185.24, "Duty and Responsibility of Contractor for Plant and Methods"; 185.25, "Protection of Work, Life and Property"; 185.26, "Public Liability, Property Damage and Automobile Insurance"; 185.28, "Laws, Permits and Regulations"; and 185.31, "State Industrial Compensation."

$519,247.40 to obtain a finished product: namely, the replacement of the bridge, as well as liability insurance coverage for the project. Cleveland retained no control over the independent contractor's conduct of the work, and there has never been any allegation that it did.

On August 23, 1991, the parties entered into an extensive "Contract and Specifications" for the project, which incorporated the above ordinances and notice to bidders. In addition to other specific terms governing the work, the contract and specifications advised ICC of its responsibility for project safety,[2] its responsibility to safeguard adjacent property in general and utilities in particular,[3] and its responsibility to comply with workers' compensation laws [4] and to be fully insured.[5]

To satisfy its insurance obligations, ICC obtained a commercial general liability policy from the Commercial Union Insurance Companies, issued by American Employers' Insurance Company ("Commercial Union"). The policy contained several endorsements to expand coverage, including an endorsement to name Cleveland as an additional insured and an employer's liability stopgap endorsement to extend coverage for claims by ICC's employees.[6]

The central issue is whether Cleveland qualified as an insured within the scope of this coverage. The policy introduction provides: "The word 'insured' means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II)." SECTION II of the policy defines "insured." ICC was the organization listed in the declarations as the named insured under Section II .1.c.

---

**2.** Paragraph B–8 governed ICC's responsibility for separating construction from adjacent areas and B–9 established ICC's responsibility for the equipment and methods used to complete the project. See C.C.O. 185.23 and 185.24, respectively.

**3.** Paragraph B–10 governed ICC's responsibility for protection of property and Paragraph C–5 governed ICC's responsibility for the care of existing utilities. See, also, Sections 185.25.

**4.** Paragraph B–26 governed ICC's responsibility for compliance with workers' compensation laws. See, also, C.C.O. 185.31.

**5.** Paragraph B–18 governed ICC's responsibility to obtain insurance. See, also, C.C.O. 185.26.

**6.** The liability insurance coverage is defined by the "EMPLOYERS LIABILITY—STOP GAP ENDORSEMENT" as follows:
"I. The Insuring Agreement of SECTION 1—COVERAGE A—is deleted and replaced by the following Insuring Agreement:
"1. Insuring Agreement.
"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" to an employee of yours arising out of and in the course of his or her employment by you in a state indicated in the schedule."
The accompanying SCHEDULE specifically lists Ohio as a covered state.

Section II of the policy was amended, however, by endorsement to include additional insureds.

The "ADDITIONAL INSURED—OWNERS, LESSEES OR CONTRACTORS (FORM B)" endorsement used in this case provides as follows:

"WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule, *but only with respect to liability arising out of 'your work' for that insured by or for you.*" (Emphasis added.)

The city of Cleveland, among others, was listed as an additional insured in the schedule under "Name of Person or Organization" as follows:

"The City of Cleveland—Re: replacement and reconstruction of Washington Ave. Bridge for Dept. Of Public Service, Division of Purchases and Supplies, Room 128—City Hall, Cleveland, Ohio 44144."

A central issue is whether the claims against Cleveland arose out of ICC's work on the project.[7]

On August 29, 1991, the parties discussed relocating the utilities surrounding the existing bridge and decided to suspend the CPP electric power lines from utility poles on the north side of the bridge where other utilities were located. John Shkil, ICC's project manager, declined CPP's offer to move the power lines to the south side of the bridge. CPP did not respond to ICC's offer to dig a trench for the lines on the north side of the bridge. From approximately October 11 through November 8, 1991, CPP moved the power lines from below the bridge to utility poles on the north side of the bridge.

ICC thereafter demolished the existing bridge without incident and rented an uninsulated forty-ton Grove crane from Construction Supplies, Inc. To operate the crane, James Kerr, ICC's general supervisor, who was working on his first bridge construction project, hired Richard Bowman. Bowman, however, was not licensed to operate the crane selected by ICC. On December 2, 1991, the crane arrived on the site, and ICC placed it at the south end of the bridge. Work reconstructing the south bridge abutment was completed without incident. On December 17, 1991, after approximately two weeks on site, ICC moved the crane

---

**7.** Section V of the policy defines the scope of ICC's work as follows:
"SECTION V—DEFINITIONS
"* * *
"15. 'Your work' means:
"a. Work or operations performed by you or on your behalf; and
"b. Materials, parts or equipment furnished in connection with such work or operations.
" 'Your work' includes:
"a. Warranties or representations made at any time with respect to fitness, quality, durability, performance or use of 'your work'; and
"b. The providing of or failure to provide warnings or instructions."

to the north side of the bridge when no one from Cleveland was present. At no time did ICC request that Cleveland take any action concerning CPP's electrical wires after it moved the crane.

Richard Klein was ICC's job superintendent in charge of safety on the worksite. Although Klein knew that applicable safety regulations required the crane to be at least ten feet from the power lines, on December 30, 1991, he directed the boom of the crane to be placed within approximately two to three feet of CPP's power lines. Having returned from lunch after drinking alcohol, Bowman, the unlicensed crane operator, operated the crane in this location. There is no evidence that Cleveland had knowledge of this dangerous situation, let alone participated in it.

Plaintiffs Michael Stickovich and David Straight, carpenters assigned by ICC to work on the project, were guiding a steel form into place to prepare for pouring concrete on the north bridge abutment when the crane came into contact with the power line. Both of them received bodily injuries and recovered workers' compensation payments after asserting that the injuries arose out of and in the course of their employment by ICC on the project.

Stickovich also filed an application with the Ohio Industrial Commission for an additional award against ICC for violation of specific safety requirements on the project ("VSSR claim"). To recover a VSSR award, an injured worker must show that his employer violated an authoritative safety requirement and that the violation was the proximate cause of his injuries.

In his VSSR application, Stickovich alleged eight violations by ICC of Ohio Adm. Code Section 4121:1–3–07, governing cranes, hoists, and derricks. Four of his claims related to operating the boom of the crane within close proximity—less than ten feet—of overhead electrical lines. Cleveland had specifically notified ICC in its notice to bidders before it commenced any work on the project that these precise safety requirements would be enforced.

Stickovich recovered on his VSSR claim against ICC by showing that ICC's violation of the safety regulations was the proximate cause of his injury. Neither he nor Straight, however, subsequently filed against ICC an intentional-tort claim asserting that their injuries were substantially certain to occur from its conduct on the project.

Instead, on March 12, 1993, Stickovich and Straight filed the case at bar against Cleveland, the crane manufacturer, and the crane lessor, Construction Supplies. They alleged that Cleveland improperly maintained the wires and that the manufacturer improperly produced and the lessor improperly leased a defective uninsulated crane to ICC without providing adequate warnings to avoid contact with electrical power lines. Cleveland requested that Commercial Union

provide a defense and liability coverage for it as an additional insured under ICC's commercial general liability policy. Commercial Union refused.

Cleveland, represented by its law department, filed an answer to the complaint as well as a third-party complaint against ICC and ICC's liability insurer Commercial Union. Cleveland's July 12, 1993 complaint alleged that ICC was negligent. Cleveland also sought a declaratory judgment against Commercial Union; it specifically requested a defense against the claims against Cleveland as well as coverage for any liability imposed against it.

Numerous other claims and cross-claims were subsequently filed by the parties. For example, crane lessor Construction Supplies also alleged that ICC was negligent. Commercial Union filed an answer to Cleveland's complaint and denied liability, but notably did not specifically raise the affirmative defense that the coverage of its own liability policy was contrary to statute or public policy as required by Civ.R 8(C).

On September 12, 1995, more than two years later, Cleveland filed a motion for summary judgment on its claims against Commercial Union. By this time discovery had revealed evidence to support claims against ICC, which raised the potential for vicarious liability of others. Commercial Union opposed Cleveland's motion and filed its own cross-motion for summary judgment. The trial court granted Cleveland's motion for summary judgment against Commercial Union and denied Commercial Union's cross-motion. In granting summary judgment, the trial court held that Commercial Union had a duty to defend and was conditionally liable for any judgment against Cleveland depending on the verdict and evidence presented at trial.

On March 29, 1996, more than three years after the action was originally filed, counsel retained by Commercial Union filed an appearance on behalf of Cleveland. Commercial Union was reluctant to defend Cleveland, however, and repeatedly sought to relitigate the coverage issues. A successor trial judge denied its requests to reconsider the coverage rulings. Commercial Union ultimately controlled the defense and exercised its exclusive right to settle the matter.[8]

Although no findings were made concerning the workers' claims or damages, against Cleveland or any of the other parties, Commercial Union agreed to pay Stickovich and Straight $1.3 million to dismiss their complaint. Also surrendered without adjudication were Cleveland's defenses. ICC was found liable to Construction Supplies for damage to its crane. All remaining claims were ultimately resolved or dismissed.

---

8. The record contains no evidence whether Cleveland agreed to the settlement.

Commercial Union now appeals from the trial court's order granting Cleveland's motion for summary judgment and denying its cross-motion for summary judgment. Commercial Union argues that its own liability insurance coverage is void and against public policy and contends that the trial court erroneously construed it to provide coverage for negligence of Cleveland, the additional insured.

Commercial Union raises the following sole assignment of error:

"The trial court improperly determined that the additional insured clause in the contractor's general commercial liability insurance policy provided coverage for the additional insured's own negligence. thus, the trial court's granting of summary judgment in favor of third–party plaintiff–appellee [city of Cleveland] requires reversal."

This assignment lacks merit.

Commercial Union disputes its duty to defend or pay its settlement and seeks an order from this court that it recover these costs. Commercial Union argues it had no duty because Cleveland does not qualify under the policy as an additional insured under the following endorsement:

"WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule [Cleveland], *but only with respect to liability arising out of 'your work' for that insured by or for you.*" (Emphasis added.)

It argues that the trial court improperly determined that the additional-insured endorsement covered Cleveland's own negligence in violation of R.C. 2305.31.

Standard principles governing insurance law and motions for summary judgment warrant affirming the trial court's judgment. Summary judgment is warranted when, after viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact, reasonable minds can come to but one conclusion, and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). After reviewing the record in accordance with this standard, we conclude the trial court properly granted Cleveland's motion and properly denied Commercial Union's cross-motion for summary judgment.

### Waiver

Commercial Union did not properly raise the affirmative defense that the coverage of its own additional-insured endorsement violated R.C. 2305.31. Its letter denying coverage did not mention R.C. 2305.31 or public policy as reasons. Moreover, Commercial Union's answer to Cleveland's third–party complaint likewise did not mention the affirmative defense of illegality of its own insurance coverage, as required by Civ.R. 8(C). It is well established that unpleaded

affirmative defenses are deemed to be waived. *E.g., Jim's Steak House, Inc. v. Cleveland* (1998), 81 Ohio St.3d 18, 688 N.E.2d 506.

This court recently held that this precise defense was waived under these circumstances in *Blount v. Digital Equip. Corp.* (Feb. 3, 2000), Cuyahoga App. No. 75298, unreported, 2000 WL 126734, stating as follows:

"We also reject Net–Tech's argument that the indemnification agreement violates R.C. 2305.31. A defense alleging the illegality of a contract is an affirmative defense. *Countrymark Coop. v. Smith* (1997), 124 Ohio App.3d 159, 164 [705 N.E.2d 738, 741–742], citing *McCabe/Marra Co. v. City of Dover* (1995), 100 Ohio App.3d 139 [652 N.E.2d 236], appeal dismissed, 72 Ohio St.3d 1529 [649 N.E.2d 839]; *Arthur Young & Co. v. Kelly* (1993), 88 Ohio App.3d 343 [623 N.E.2d 1303], cause dismissed, 67 Ohio St.3d 1462 [619 N.E.2d 697]. As such, it must be raised in a responsive pleading or it is deemed waived. *McCabe/Marra Co. v. City of Dover* (1995), 100 Ohio App.3d 139, 147 [652 N.E.2d 236, 241]. Net–Tech did not raise the issue of the illegality of the indemnification agreement and, therefore, has waived this issue." *Id.* at 4.

As in *Blount,* Commercial Union's answer to Cleveland's third–party complaint did not raise the affirmative defense of illegality, did not mention R.C. 2305.31, and did not assert that the additional-insured endorsement violated public policy in any way. Accordingly, these arguments are deemed to be waived.[9] *Id.*

### Public Policy

Even if Commercial Union's public policy argument were not deemed to be waived, the argument is unpersuasive in the case at bar. Both Commercial Union and the dissent argue incongruously that a public agency violates public policy by obtaining compulsory liability insurance to protect the public from liability on a public works project. Neither has cited any authority holding that a governmental agency's official actions within its jurisdiction and discretion violate public policy.

The public works contract and liability insurance agreements were authorized by the Ohio Constitution, Cleveland's Charter, and the Ohio Revised Code.[10]

---

9. The dissent has one contention: that no waiver occurred, because insurance coverage is against public policy in the case at bar. We need not decide whether a party could validly waive a well-grounded public-policy defense because, as discussed below, Commercial Union did not satisfy its burden of proof that insurance coverage was against public policy. Finally, contrary to the dissent, even if the public-policy argument were not waived and coverage of negligence by Cleveland were against public policy, Commercial Union has not shown that its insurance contract or settlement was in fact applied to cover actionable negligence by Cleveland that proximately caused the workers' injuries.

10. More than other such public agencies, Cleveland, as a charter municipality, has the full measure of direct constitutional authority to exercise all powers of local self-government, as

Cleveland Ordinance No. 993–90 specifically authorized and directed the city to enter into the challenged public works contracts, which incorporated the challenged substantive terms from Chapter 185 of Cleveland's codified ordinances.

Liability insurance was compulsory both by law, C.C.O. 185.26, and by contract. Paragraph B–18 of the contract and specifications specifically required ICC to obtain the insurance coverage at issue:

"PUBLIC LIABILITY, PROPERTY DAMAGE AND AUTOMOBILE INSURANCE

"a. The Contractor [ICC] shall take out and maintain during the life of this contract such public liability and property damage insurance, wherein the City of Cleveland is named as an additional insured, as shall protect himself, the City of Cleveland and any subcontractor performing work covered by this contract from claims for damage for personal injury, including accidental death, as well as from claims for property damages which may arise from operations under this contract, whether such operations be by himself or by any subcontractor or by anyone directly or indirectly employed by either of them. An exact copy of such policy or policies shall be deposited with the City of Cleveland before the commencement of any work under the contract."

Liability insurance was compulsory precisely to protect the public from liability and to provide a fund for anyone injured in connection with the project.

██ Any doubt concerning the governing public policy in this context is dispelled by R.C. 2744.08(A)(1), which specifically authorizes political subdivisions to obtain liability insurance to provide coverage for their own alleged negligence, as follows:

██ "(A)(1) A political subdivision may use public funds to secure insurance with respect to its and its employees' potential liability in damages in civil actions for injury, death, or loss to persons or property allegedly caused by an act or omission of the political subdivision or any of its employees in connection with a governmental or proprietary function. The insurance may be at the limits, for the circumstances, and subject to the terms and conditions, that are determined by the political subdivision *in its discretion.*"

---

well as direct constitutional authority to operate its electric utility. Ohio Constitution Sections 3, 4 and 7, Article XVIII; Cleveland Charter Sections 1 and 2. Even when not granted by the Constitution or by charter, R.C. 715.06(C) recognizes the authority of municipal corporations to establish and operate power utilities and to "procure everything necessary for such operation." It takes no stretch of imagination to conclude that one such necessity might be liability insurance, particularly when such insurance is also specifically authorized by R.C. 2744.08(A)(1), as discussed below.

Enacted after R.C. 2305.31, R.C. 2744.08(A)(1) specifically governs political subdivisions obtaining insurance and controls in case of any conflict. In short, contrary to Commercial Union's argument and the dissent's novel and unsound assertion, there is no public policy against political subdivisions obtaining liability insurance coverage on public works projects.

█ In a free and democratic society, freedom of contract is the general rule; public-policy limits are the exception. The doctrine does not grant courts a roving commission to police the terms of agreements and must be cautiously applied lest the exception swallow the rule. The Ohio Supreme Court has repeatedly admonished the courts against the loose application of "public policy" to invalidate agreements, even in the context of ordinary contracts between private parties not authorized by specific legislation as in the case at bar:

"When judges come to apply the doctrine, they must take care not to infringe on the rights of the parties to make contracts which are not *clearly* opposed to some principle or policy of law." (Emphasis added.) *Lamont Bldg. Co. v. Court* (1946), 147 Ohio St. 183, 185, 34 O.O. 73, 74–75, 70 N.E.2d 447, 448. This is true, of course, even in the context of invalidating liability insurance coverage. *E.g., Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 738 N.E.2d 1243 (narrowing an appellate court's determination that public policy precluded insurance coverage for certain claims related to sexual molestation).

█ As a general rule, neither indemnity agreements nor liability insurance contracts are against public policy. See *e.g., Glaspell v. Ohio Edison Co.* (1987), 29 Ohio St.3d 44, 29 OBR 393, 505 N.E.2d 264. In the context of insurance, one is more apt to encounter public-policy arguments to require coverage or to override policy exclusions, rather than to invalidate coverage, because the predominate social purpose of liability insurance is to compensate injured persons. This is precisely why liability insurance is sometimes compulsory, as in the case at bar.

Rather than simply invoking the nebulous catch phrase of public policy as Commercial Union requests, it is our duty to carefully review and apply the statute as written by the General Assembly. Careful review of the language used by the General Assembly reveals that R.C. 2305.31 does not invalidate commercial liability insurance coverage for construction projects—let alone "clearly" invalidate such insurance—particularly when the coverage is obtained by public agencies as in the case at bar.

## R.C. 2305.31

R.C. 2305.31 contains two sentences. The first sentence is lengthy and prohibits certain *construction indemnity agreements*. The second sentence

contains an exception for *insurance*. The argument that R.C. 2305.31 bars insurance coverage in the case at bar requires failing to distinguish between indemnity agreements and liability insurance contracts, a distinction long recognized by the General Assembly and Ohio law.

R.C. 2305.31 provides in its entirety as follows:

"A covenant, promise, agreement, or understanding in, or in connection with or collateral to, a contract or agreement relative to the design, planning, construction, alteration, repair, or maintenance of a building, structure, highway, road, appurtenance, and appliance, including moving, demolition, and excavating connected therewith, pursuant to which contract or agreement the promisee, or its independent contractors, agents or employees has hired the promisor to perform work, purporting to indemnify the promisee, its independent contractors, agents, employees, or indemnities against liability for damages arising out of bodily injury to persons or damage to property initiated or proximately caused by or resulting from the negligence of the promisee, its independent contractors, agents, employees, or indemnities is against public policy and is void. *Nothing in this section shall prohibit any person from purchasing insurance from an insurance company authorized to do business in the state of Ohio for his own protection or from purchasing a construction bond.*" (Emphasis added.)

The language, structure, and purpose of R.C. 2305.31, the General Assembly's use of these terms, and the history of cases interpreting this provision reveal that it does not apply to any aspect of the public works bridge contract in the case at bar.

### Language of R.C. 2305.31

R.C. 2305.31 does not state that it applies to public agencies. Use of the terms "highway" and "road" in the statute reveals such a legislative intent, because the statute otherwise applies by its own terms to subsequent transactions between private parties, such as contractors and subcontractors on such projects. Even if the statute were deemed to apply to public agencies, however, it does not expressly mention bridge projects.

R.C. 2305.31 is narrowly drawn and contains other relevant limitations. For example, by its own terms, the statute does not prohibit a construction contractor from indemnifying others for its nonnegligent intentional torts. The statute prohibits only construction indemnity agreements that indemnify "liability for damages arising out of bodily injury to persons or damage to property initiated or proximately caused by or resulting from the *negligence* of the promisee." (Emphasis added.) A mere allegation of negligence is not sufficient to defeat a construction indemnity agreement. Even if there were proof that the party seeking indemnity were negligent, the negligence must still be the proxi-

mate cause of the injury. Finally, the statute applies only to voluntary agreements, but not when indemnity arises by operation of law in favor of parties with passive or secondary conduct.

### Liability Insurance v. Indemnity Agreements

The argument that R.C. 2305.31 bars liability insurance in the case at bar requires confusing two different contracts (an insurance contract and the construction agreement), two different parties (a commercial insurer and the contractor—"promissor"), and two different duties (the duty to defend and pay on liability contract and the duty to indemnify). Even if R.C. 2305.31 applied to invalidate any terms of the public works construction contract, this appeal involves a claim against an insurer on a *commercial liability insurance policy*. The case does not raise a claim against a contractor on a *construction indemnity agreement*.[11]

A commercial liability insurance policy is not a construction indemnity agreement within the scope of R.C. 2305.31 and is valid and enforceable under its own terms. See, *e.g.*, Schneier, Construction Accident Law: A Comprehensive Guide to Legal Liability and Insurance Claims 473–475 (ABA 1999); Analysis, Anti–Indemnity Statutes Do Not Invalidate Agreements to Procure Liability Insurance Protecting the Promisee, 14 Construction Law Reporter (1993) 9.

The business of insurance is different from other risk-allocation contracts. *E.g., Griffin Sys., Inc. v. Ohio Dept. of Ins.* (1991), 61 Ohio St.3d 552, 575 N.E.2d 803 (distinguishing insurance regulated by R.C. 3905.42 from other agreements). Indemnity agreements among those participating in construction projects are different from liability insurance contracts—purchased from commercial insurers who are not parties to the construction project—and do not involve insurance. This court recently recognized this precise distinction in *Dietz–Britton v. Smythe, Cramer Co.* (2000), 139 Ohio App.3d 337, 743 N.E.2d 960, as follows:

"As a matter of common understanding, usage, and legal definition, an insurance contract denotes a policy issued by an authorized and licensed insurance company whose primary business it is to assume specific risks of loss of members of the public at large in consideration of the payment of a premium. There are,

---

11. Paragraph B–41 of the contract and specifications for the project contains an "Indemnity Clause" in which ICC agreed to indemnify Cleveland under certain circumstances. The clause does not violate R.C. 2305.31 on its face because it does not require ICC to indemnify Cleveland for Cleveland's own negligence. Even if the clause were invalid (which we need not decide), it would have no effect on this case. Cleveland's claims are against Commercial Union (not ICC) and are based on the liability insurance contract issued by Commercial Union. Commercial Union's duties arise under its own liability insurance contract and do not involve ICC's duty to indemnify Cleveland under Paragraph B–41 or to obtain insurance for Cleveland under Paragraph B–18 of the contract.

however, other risk-shifting agreements which are not insurance contracts. These include the customary private indemnity agreement where affording the indemnity is not the primary business of the indemnitor and is not subject to governmental regulation but is merely ancillary to and in furtherance of some other independent transactional relationship between the indemnitor and the indemnitee. The indemnity is, thus, not the essence of the agreement creating the transactional relationship but is only one of its negotiated terms." *Id.* at 354–355, 743 N.E.2d at 973.

The case at bar involves an insurance contract, not a construction indemnity agreement.

■ Commercial Union and the dissent fail to distinguish the construction indemnity agreement from the liability insurance contract. It is well established that under indemnity agreements, before being reimbursed by the indemnitor, the indemnitee must pay a final judgment against him in favor of the injured party. See, *e.g., State Auto. Mut. Ins. Co. v. Columbus Motor Express* (1933), 15 Ohio Law Abs. 747, 748, 1933 WL 2256. In the context of liability insurance, however, the insurer becomes liable upon the loss and directly pays the injured party rather than reimbursing its insured.

With these distinctions in mind, a review of the express terms of R.C. 2305.31 reveals that it does not preclude purchasing commercial liability insurance for public works construction projects.[12] To support such a preclusion, one must read the first sentence of R.C. 2305.31 too broadly and the second sentence too narrowly. The first sentence does not prohibit commercial liability insurance policies, because they are not construction indemnity agreements. The second sentence, moreover, expressly permits such liability insurance contracts and does not expressly prohibit naming more than one insured on such insurance contracts. *Employers' Fire Ins. Co. v. Danis Bldg. Constr. Co.* (Aug. 22, 2000), C.A.6 No. 99–3987, unreported, 2000 WL 1234321; *Brzeczek v. Std. Oil Co.* (1982), 4 Ohio App.3d 209, 212, 447 N.E.2d 760.

### Purpose of Statute

■ The purpose of R.C. 2305.31 is to protect worker safety and protect contractors from being compelled to assume liability for the negligence of others. Neither purpose is harmed by permitting standard commercial liability insurance for which an independent third-party insurer is paid a premium to accept the risk of loss. Injured workers are compensated and contractors do not bear the harsh

---

12. This is particularly true and unambiguously clear when one also considers R.C. 2744.08(A)(1), which specifically authorizes political subdivisions to secure liability insurance.

burden of bearing the cost for others' negligence. This commonsense reading of R.C. 2305.31 is also consistent with the purposes of insurance law.

R.C. 2305.31, significantly, is not codified in the Insurance Code, R.C. Chapter 39, and does not place a limitation on actions on liability insurance policies. When the General Assembly intends to announce a statutory policy limiting recovery on liability insurance contracts, it knows how to do so with clarity. See *e.g.,* R.C. 3937.182 (prohibiting coverage for punitive or exemplary damages). R.C. 2305.31 does not provide any such clear limitation. Unlike construction workers and contractors, moreover, commercial liability insurance companies are not within the class of persons to be protected by R.C. 2305.31.

## History of R.C. 2305.31

Both Ohio law and the Ohio General Assembly have recognized these distinctions for more than eighty years. In 1919, the General Assembly enacted G.C. 9510–3 and 9510–4, which are now codified at R.C. 3929.05 and 3929.06, respectively. The effect of these provisions was to mandate that insurance agreements covering injury to persons be in the form of liability rather than indemnity policies.[13] *Steinbach v. Maryland Cas. Co.* (1921), 15 Ohio App. 392; 58 O.Jur.3d (1985), Insurance, Sections 966–967. Thus there is no way that the liability insurance contract in the case at bar can be construed to constitute an indemnity agreement.

The General Assembly understood this distinction, and courts have recognized these principles in this precise context when considering public policy under R.C. 2305.31. See *Employers' Fire Ins. Co. v. Danis Bldg. Constr. Co.* (July 12, 1999), S.D.Ohio No. 97–00241, unreported, at 4–5. The Sixth Circuit Court of Appeals recognized that "[s]trictly speaking, it is misleading to speak of indemnification in this context," but vacated the trial court's opinion because it should have abstained from ruling on the dispute. *Employers' Fire Ins. Co. v. Danis Bldg. Constr. Co., supra,* at * 4.

Judicially announced principles of public policy generally forbid a party to shift the risk of loss by insurance when its wrongdoing is deliberate and is reflected in policy terms such as "accident," or "occurrence." There is no claim (or evidence) that Cleveland deliberately injured ICC's employees, and there is less reason to believe that a public agency might indulge in moral hazard because of liability insurance.

---

**13.** There is no dispute that the liability policy, the additional insured endorsement, and the employers'-liability endorsement are in the form of liability rather than indemnity contracts in the case at bar.

Cases citing R.C. 2305.31 recognize these distinctions and generally reflect this carefully measured approach to invalidating agreements on public policy grounds. Most of the approximately fifty opinions citing R.C. 2305.31 involve indemnity agreements rather than liability insurance contracts and have found, for one reason or another, that the statute does not invalidate the challenged agreement.

The Ohio Supreme Court has never applied R.C. 2305.31 to liability insurance contracts. In only one of six cases citing the statute, moreover, has the Supreme Court held that the challenged agreement violated public policy. In its only case mentioning both R.C. 2305.31 and insurance, the court recognized the distinction between liability insurance and indemnity agreements and also recognized that each party could "provide against loss by insurance or other means." *Glaspell v. Ohio Edison Co., supra,* 29 Ohio St.3d at 47, 29 OBR at 396, 505 N.E.2d at 267.

For more than twenty years after the passage of R.C. 2305.31 in 1975, cases involving the claim that an insurance contract violated R.C. 2305.31 held that the insurance contract was not against public policy. See *Brzeczek v. Std. Oil Co., supra; Lewis v. Ohio Edison Co.* (Jan. 9, 1991), Mahoning App. No. 89 CA 150, unreported, 1991 WL 1571 and *Legge Assoc. v. Dayton Power & Light* (Apr. 22, 1997), C.A.6 Nos. 95–4043 and 95–4050, unreported, 1997 WL 199491.[14] Of these, *Lewis v. Ohio Edison Co.* is particularly instructive because it declined to invalidate insurance coverage for a utility on a claim by a contractor's employee injured by electricity adjacent to the worksite while he was performing the work as in the case at bar. In the case at bar, the two successive trial judges ruled consistent with *Lewis.*

### Zavarella

To support its argument to the contrary, Commercial Union relies on a single case, which it cited for the first time in its second motion for reconsideration below. The case, *Buckeye Union Ins. Co. v. Zavarella Brothers Constr. Co.* (1997), 121 Ohio App.3d 147, 699 N.E.2d 127, is somewhat obscure, but distinguishable. Although *Zavarella* came late in the history of R.C. 2305.31, it did not mention the Supreme Court's opinion in *Glaspell,* did not cite, apply, or distinguish *Lewis,* and did not acknowledge that it marked a significant departure from eighty years of history distinguishing indemnity agreements from liability insurance contracts and twenty years of interpreting R.C. 2305.31 or that it adopted the so-called minority rule on this issue.

Since *Zavarella* was issued, the case has had a checkered history: To date, two cases have cited it in split opinions with dissents, and a federal magistrate

---

14. The General Assembly's enactment of R.C. 2744.08(A)(1) in 1985 makes this unambiguously clear with respect to political subdivisions.

declined to follow it because of its failure to distinguish liability from indemnity. As noted above, however, the Sixth Circuit Court of Appeals, holding that the federal court should abstain from the dispute, vacated the magistrate's opinion and left the disagreement for the Ohio state courts to resolve. The *Zavarella* opinion is more opaque than the language of R.C. 2305.31 that it interprets and contains few of the underlying facts, so it is not helpful in understanding how to apply R.C. 2305.31 to the facts of a particular case. If read and applied as Commercial Union and the dissent suggest, *Zavarella* may have been wrongly decided, but, in any event, is readily distinguishable.

Although *Zavarella* and the case at bar appear superficially similar to the extent that both cases involve insurance coverage disputes after an injury on a construction site, the two cases differ markedly. *Zavarella* arose in a different procedural setting, with different substantive facts, and different contract language. In addition to the substantive facts, at least four significant differences are manifest.

First, unlike the case at bar, the insurer issuing the additional-insured endorsement in *Zavarella* apparently raised and, therefore, did not waive, the affirmative defense that coverage under its own liability insurance contract violated public policy.[15] Second, *Zavarella* did not involve a public works bridge project—a project authorized by the Ohio Constitution and Revised Code, as well as the Cleveland Charter and ordinances—and a project that did not even fall within the scope of R.C. 2305.31. Third, there were no claims of negligence against the contractor, and no other parties were involved in the *Zavarella* litigation to indicate that anyone other than the additional insured was negligent and caused the injury.[16] Fourth, *Zavarella* did not hold that a mere allegation of negligence defeats an insurer's duty to defend an additional insured, because it expressly declined to express any opinion concerning this issue:

"As an alternative ground for summary judgment, Buckeye [on behalf of the additional insured] argued that American [the insurer issuing the additional insured endorsement] breached its duty to defend. It did not separately set forth this issue as a separate argument in its merit brief, so we consider that issue

---

**15.** The opinion in *Zavarella* did not expressly state whether the insurer properly raised this affirmative defense in its answer. However, *Zavarella* did cite *McCabe/Marra Co. v. Dover, supra,* upon which this court relied in *Blount v. Digital Equip. Corp., supra,* to find this defense waived when not properly raised.

**16.** Unlike *Zavarella,* the case at bar involved multiple claims and parties: Alleging tort liability, three parties sued ICC, the named insured contractor, and two parties other than the injured employees sued Cleveland, the additional insured. Even under the majority's own theory, in light of these allegations, liability claims against Cleveland as the additional insured were potentially derivative of these other parties.

waived on appeal. *Hawley v. Ritley* (1988), 35 Ohio St.3d 157, 159, 519 N.E.2d 390, 392–393." *Zavarella,* 121 Ohio App.3d at 152, 699 N.E.2d at 131, fn. 1.

In addition to these basic differences, the underlying facts of *Zavarella* are also readily distinguishable. In *Zavarella,* a subcontractor's employee was injured in a fall, the circumstances of which were not described. He obtained workers' compensation benefits and lost by directed verdict on his intentional-tort claim against Zavarella, the subcontractor and his employer, *because there were no facts to support his intentional tort claim.* The employee thereafter sued the project general contractor, Snavely, who was named as an additional insured under the subcontractor's insurance policy.

The subcontractor's insurer refused to defend the claim, so the general contractor's own insurer defended and settled it. The general contractor's insurer thereafter sued the subcontractor's insurer to recover the amount of its settlement and defense costs, which were covered by its own insurance policy. Unlike the case at bar, the general contractor's insurer did not raise a claim that the subcontractor's insurer breached its duty to defend and the subcontractor's insurer raised the affirmative defense that coverage under its policy would be "tantamount to indemnification." *Zavarella,* 121 Ohio App.3d at 150, 699 N.E.2d at 129.

### *Kendall v. U.S. Dismantling Co.*

The *Zavarella* Court—failing to distinguish liability insurance contracts from construction indemnity agreements—relied on *Kendall v. U.S. Dismantling Co.* (1985), 20 Ohio St.3d 61, 20 OBR 360, 485 N.E.2d 1047, which involved a construction indemnity agreement, but not liability insurance. Because no liability insurance was involved, *Kendall* did not cite or apply the second sentence of R.C. 2305.31 involved in *Zavarella* or the case at bar. *Id.* at 62, 20 OBR at 360–361, 485 N.E.2d at 1049. Even though *Kendall* did not involve liability insurance, *Zavarella* concluded that paragraph one of its syllabus prohibited liability insurance contracts. *Zavarella,* 121 Ohio App.3d at 150, 699 N.E.2d at 129–130.

*Kendall,* however, held that an indemnity agreement between two private parties in a contract to dismantle a factory was barred by R.C. 2305.31, stating:

"R.C. 2305.31 prohibits *indemnity* agreements, in the construction-related contracts described therein, whereby the *promisor agrees to indemnify the promisee* for damages caused by or resulting from the negligence of the promisee, regardless of whether such negligence is sole or concurrent." (Emphasis added.) *Kendall,* 20 Ohio St.3d 61, 20 OBR 360, 485 N.E.2d 1047, paragraph one of the syllabus.

As noted above, however, because *Zavarella* and the case at bar involve liability insurance, a commercial liability insurer, rather than the contractor (that

is, the "promisor"), agrees to pay the injured party, rather than "indemnify the promisee." *Zavarella*'s misapplication of *Kendall* requires confusing different contracts, different parties, and different duties.

 To reach the result advocated by Commercial Union and the dissent requires an increasingly loose use of the term "indemnity." Contrary to *Zavarella*, R.C. 2305.31 does not by its own terms prohibit agreements "tantamount" to, that is, in effect like, indemnity, as argued in that case. *Zavarella*, 121 Ohio App.3d at 150, 699 N.E.2d at 129–130. The General Assembly understands the distinction between liability insurance and indemnity contracts. By its own terms R.C. 2305.31 prohibits only certain construction indemnity agreements, not ones that are tantamount to such agreements.

 It would go far beyond *Zavarella* to hold that the promisor indemnifies the promisee by naming the promisee as an additional insured. It is a fiction to suggest that a contractor indemnifies the property owner by naming it as an additional insured on a liability insurance policy. The commercial liability insurer has a separate and independent duty under the insurance contract on which the owner is named as an additional insured, but the contractor does not either (1) enter into an indemnity agreement or (2) agree to indemnify the owner under the insurance contract simply by requesting that it be named as an insured on a liability insurance policy.

### Intentional Tort Evidence

Commercial Union and the dissent also ignore another important substantive distinction between *Zavarella* and the case at bar. Unlike the employee in *Zavarella*, the employees in the case at bar had not lost their intentional tort claims against their employer for lack of proof. It would be wrong to conclude that there are no facts that would suggest that intentional tort liability could be imposed against ICC, their employer, and the named insured in the case at bar.

To the contrary, the record in the case at bar shows that ICC was found by the Industrial Commission to have violated specific safety regulations in Ohio Adm. Code 4121:1–3–07, which prohibited it from operating the crane as it did near overhead electric wires. Not only does directing the operation of an uninsulated crane by an unlicensed operator who had been drinking alcohol in violation of these regulations create a substantial certainty of injury, but the VSSR award was made precisely because the violation by ICC was the proximate cause of the employee's injury. See, *e.g., State ex rel. Newman v. Indus. Comm.* (1997), 77 Ohio St.3d 271, 673 N.E.2d 1301. The crane rental company alleged negligence by ICC and recovered for damage to its crane.

The insurance contract defines coverage in terms of causation and grants coverage "with respect to liability arising out of '[ICC's] work." ' *Zavarella* asserted that, under the unique circumstances of that case,[17] there were no ambiguities regarding the additional insured's own negligence or proximate cause. Because it stated no facts concerning how the injury occurred, unlike virtually every other case applying R.C. 2305.31, it is impossible to disagree with these assertions. It would require going beyond *Zavarella*, however, to invalidate coverage despite all these differences merely because an allegation of negligence was made against Cleveland.

By its own terms, R.C. 2305.31 prohibits only construction indemnity agreements that indemnify "against liability for damages arising out of bodily injury to persons or damage to property initiated or proximately caused by or resulting from the negligence of the promisee." The case at bar does not literally involve indemnity. Moreover, the VSSR award and other evidence shows that proximate cause was ICC's violation of the Ohio Administrative Code safety requirements. The case at bar does not fall literally within the scope of R.C. 2305.31 and is not "tantamount" to such a case. One could reach that conclusion only by ignoring basic distinctions and the facts of the case.

The Ohio Supreme Court has recently recognized the distinction between construction indemnity agreements and insurance contracts, a distinction which *Zavarella* failed to make by misapplying *Kendall. Kemmeter v. McDaniel Backhoe Serv.* (2000), 89 Ohio St.3d 409, 732 N.E.2d 385. After reciting the syllabus of *Kendall* and the policy it embodies, the *Kemmeter* Court stated: "The statute [R.C. 2305.31] voids contract terms where a promisee attempts to shift responsibility for its negligence to the promisor." *Id.* at 411, 732 N.E.2d at 387. In the case of liability insurance contracts, however, the risk is transferred to the commercial liability insurer rather than the contractor-promisor and does not violate R.C. 2305.31.

Moreover, even in the context of indemnity agreements, *Kemmeter* held that indemnity agreements in favor of the general contractor are not barred if the accident arose out of "activities under the contractual control" of the subcontractor. *Id.* at 413, 732 N.E.2d at 388. To the extent that *Kemmeter* applies beyond its own terms to liability insurance contracts, as distinguished from such construction indemnity agreements, it supports the result reached by the trial court.

---

17. The court stated:
 "We hold that the additional insured agreement does not violate public policy, but that the express language of the policy does not afford coverage *under the circumstances*." 121 Ohio App.3d at 148, 699 N.E.2d at 128 (Emphasis added).

The workers' injuries arose out of ICC's selection, staffing, and operation of the crane, which activities were under its exclusive contractual control.[18]

Finally, *Kemmeter* also expressly recognized that the mere assertion of a negligence claim is not sufficient to preclude coverage. Even if a construction indemnity agreement "facially violated R.C. 2305.31," recovery was nevertheless permissible if the injury arose out activities within the contractor's contractual control. 89 Ohio St.3d at 413, 732 N.E.2d at 388.

Cleveland contracted for a completed product, namely, the bridge. ICC was an independent contractor free to select the tools and methods to complete its task. Cleveland did not control or specify the manner of performance by ICC or its employees. Cleveland did not control ICC's selection of an uninsulated crane, did not control ICC's selection of an unlicensed operator, did not control ICC's location of the crane, and did not control ICC's operation of the crane in knowing violation of safety regulations. See C.C.O. 185.23, 185.24, and 185.25; contract paragraphs B-8, B-9, B-10, and C-5.

Before the project began, Cleveland gave ICC notice that ICC had to comply with Ohio Adm. Code 4121:1-3-07. ICC selected the crane, used it without incident, and moved the crane when no one from Cleveland was on the site. ICC did not request that Cleveland do anything to the wires after moving the crane. ICC directed its unlicensed crane operator—after he had been drinking alcohol at lunch—to operate the crane in violation of the safety regulations of the Ohio Administrative Code. There is no evidence that Cleveland had knowledge of this dangerous situation, let alone participated in it. ICC's operation of the crane in violation of these regulations was already determined to be the proximate cause of one employee's injury in the context of his VSSR claim against ICC. In short, the workers' injuries arose from ICC's operation of the crane on the project.

### Scope of Liability Insurance Contract

*Allegations of Negligence*

We are required to construe and apply the terms of the liability insurance contract in light of the pleadings and evidence. The liability insurance contract, through the additional insured endorsement, provides coverage for "liability arising out of your [ICC's] work." Commercial Union did not draft the endorsement to contain any express exclusion or limitation for allegations of negligence made against the additional insured. It contends nevertheless that the liability insurance contract should be construed as if it contained such an exclusion or limitation because it would otherwise violate public policy.

---

18. See the ordinances and contract specifications referred to in fn. 1 through 4.

■ Even if Commercial Union had properly raised this affirmative defense, it did not satisfy its burden of proving that liability insurance coverage violated public policy. For the reasons set forth above, Commercial Union has not shown that liability insurance coverage violates public policy even if it were construed to cover Cleveland's alleged negligence. Liability insurance contracts routinely provide coverage for an insured's own negligence. Moreover, even if coverage were limited to exclude Cleveland's own negligence, Commercial Union has not shown the trial court construed its endorsement to provide coverage for actionable negligence by Cleveland, which caused the workers' injuries.

■ Simply stated, an allegation of negligence against an additional insured in a complaint does not categorically preclude an insurer's duty to defend or pay under a liability insurance contract. Unlike the above cases recognizing coverage, *Zavarella* did not even cite the allegations in the complaint for which coverage was sought. For example, *Lewis v. Ohio Edison, supra*, involved both an insurance policy and an indemnity agreement, both of which were found to be enforceable despite R.C. 2305.31. "Lewis [the contractor's employee] alleged that he sustained personal injuries on May 28, 1986 while employed by Corcon [the contractor] to paint an electrical substation in Lowellville, Ohio. He alleged that Corcon contracted with Ohio Edison to paint the electrical substation which was owned and operated by Ohio Edison." *Id.* at 2. The court stated, "[T]he facts herein are very complex and it is not so clear that there is no possibility of coverage." *Lewis, supra* (Jan. 9, 1991), Mahoning App. No. 89 CA 150, at 4.

The Fourth District Court of Appeals construed a similar additional-insured endorsement to a commercial general liability policy to provide coverage for claims against a public agency for its own alleged negligence in *Washington Cty. A. & M. Assoc. v. T.H.E. Ins. Co.* (Dec. 22, 1992), Washington App. Nos. 92CA4 and 92CA13, unreported, 1992 WL 388549. Washington County Fair ("WCF") contracted with an independent contractor to provide a Fourth of July fireworks display. A child was injured the day after the show when an unexploded firework he picked up from the ground detonated in his hand. Alleging negligence, the child sued WCF and the contractor.

The additional-insured endorsement issued by T.H.E. Insurance Company provided coverage to WCF "only as respects accidents arising out of the business operations of the primary insurer." There was some evidence that the public authority was responsible for cleanup of the site after the show. The policy defined the contractor's work to include "work or operations performed by you or on your behalf" as in the case at bar. Contrary to Commercial Union's argument, the trial court's conclusion that the liability insurer had a duty to defend WCF and pay damages was affirmed on appeal. *Id.* at 4; accord, *e.g.*, *McIntosh v. Scottsdale Ins. Co.* (C.A.10 1993), 992 F.2d 251.

■ Commercial Union's additional insured endorsement in the case at bar provides coverage "with respect to liability arising out of 'your [ICC's] work' for that insured [Cleveland] by or for you." The injured worker's complaint alleged:

"4. On December 30, 1991, the plaintiffs, Michael Stickovich and David Straight, were employed by Industrial Construction, Inc. [ICC] on a job site at the Washington Street bridge in Cleveland, Ohio. The plaintiffs were assigned to rebuild the bridge pursuant to a contract with the City of Cleveland. * * *

"5. Said crane was designed, manufactured and sold by defendant Grove North America. Said crane was leased to Industrial Construction Co., Inc. [ICC] by defendant Construction Supplies.

"6. During the course of guiding the metal form being lowered by the crane, the plaintiffs were severely burned by electrocution as a result of an electrical event occurring between a portion of the crane and the high voltage wires owned and maintained by defendant City of Cleveland."

Although the complaint also contained an allegation that Cleveland was negligent, *id.* at para. 7, the quoted allegations in other paragraphs of the complaint reveal that the claims "arose out of ICC's work" on the project.

■ The term "arising out of" in a liability insurance policy affords very broad coverage. This court has held that "arising out of" means "flowing from" or "having its origin in." *E.g., Nationwide Mut. Fire Ins. Co. v. Turner* (1986), 29 Ohio App.3d 73, 77, 29 OBR 83, 87–88, 503 N.E.2d 212, 217 (holding that the shooting of a family member by an insane person fell within the homeowner's insurance coverage for injuries "arising out of the use of real property"). The term "arising out of" has also been defined to mean "originating from," "growing out of," or "flowing from." *E.g., Nationwide Ins. Co. v. Auto–Owners Mut. Ins. Co.* (1987), 37 Ohio App.3d 199, 202, 525 N.E.2d 508, 510–511 (holding that the unloading of firearm before entering a vehicle was covered by both the homeowner's and automobile insurance policies because the injury from discharge of the weapon arose out of the use of personal property and out of the use of the vehicle). The term "arising out of" does not require that the conduct be the proximate cause of the injury, only that it be causally related. Under the circumstances, Commercial Union has not shown the trial court erred by concluding it had a duty to defend or to conditionally pay any damages in the case at bar.

*Duty To Defend*

■ It is well established, contrary to Commercial Union's argument, that insurers are required to provide a defense when allegations are arguably or potentially within the policy coverage or when there is some doubt as to whether they state a theory of recovery within the scope of the policy. Both *Lewis v.*

*Ohio Edison* and *Washington Cty. Fair* cite *Willoughby Hills v. Cincinnati Ins. Co.* (1984), 9 Ohio St.3d 177, 459 N.E.2d 555, for this proposition:

"Where the insurer's duty to defend is not apparent from the pleadings in the action against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim." *Id.* at syllabus.

Under the circumstances, the claims by the workers, crane manufacturer, and lessor were sufficient, or at least sufficiently ambiguous, to require a defense. *Lewis* quoted *Willoughby* at length concerning the insurer's duty to defend claims against a utility by a contractor's employee injured by electricity adjacent to a worksite while he was performing the work as in the case at bar:

"The Ohio Supreme Court went on to say, at pages 179–180 [9 OBR at pages 464–465, 459 N.E.2d at pages 557–558]:

" '* * * For instance, in *Allen v. Standard Oil Co.* (1982), 2 Ohio St.3d 122 [2 OBR 671, 443 N.E.2d 497], this court held that, in the context of an indemnification agreement, the duty to defend could attach at some later stage in the litigation despite the fact that the pleadings did not conclusively establish the duty.

" 'The rationale for the rule was stated in *Milliken, supra* [*Milliken v. Fid. & Cas. Co. of New York* (C.A. 10, 1964), 338 F.2d 35], at page 40, as follows:

" 'The reason for this rule is that "* * * under the Federal Rules of Civil Procedure the dimensions of a lawsuit are not determined by the pleadings because the pleadings are not a rigid and unchangeable blueprint of the rights of the parties. * * *" '

" 'Further, in *Solo Cup Co. v. Federal Ins. Co.* (C.A.7, 1980), 619 F.2d 1178, the court stated at 1185:

" ' "* * * especially since the advent of notice pleading, in a case where there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded in the underlying complaint, the insurer must defend, and its defense obligations will continue until such time as the claim against the insured is confined to a recovery that the policy does not cover." See, also, *Hagen Supply Corp. v. Iowa National Mut. Ins. Co.* (C.A.8, 1964), 331 F.2d 199, 204.

" 'Like the federal system, Ohio has embraced notice pleading through adoption of the Ohio Rules of Civil Procedure. See Civ.R. 8(A) and (E). No longer must a complaint set forth specific factual allegations. All that Civ.R. 8(A) requires is "* * * (1) a short and plain statement of the claim showing the pleader is entitled

to relief, and (2) a demand for judgment for the relief to which he deems himself entitled. * * *"

" 'In addition, no longer is a trial strictly limited to the issues raised in the pleadings. See Civ.R. 15(B).

" 'It follows that the pleadings alone may not provide sufficient factual information to determine whether the insurer has an obligation to defend the insured. It remains true that where the pleadings unequivocally bring the action within the coverage afforded by the policy, the duty to defend will attach. *Motorists Mut.*, *supra* (*Motorists Mut. v. Trainor* [1973], 33 Ohio St.2d 41, 294 N.E.2d 874); *State Farm Fire & Cas. Co. v. Pildner* (1974), 40 Ohio St.2d 101 [69 O.O.2d 509, 321 N.E.2d 600]. However, where the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim. *Thus, the "scope of the allegations" may encompass matters well outside the four corners of the pleadings.'* (Emphasis and inserts added.)

"Appellee Buckeye Union cites *Wedge Products Inc. v. Hartford Equity Sales Co.* (1987), 31 Ohio St.3d 65 [31 OBR 180, 509 N.E.2d 74], for the proposition that an insurer is not obligated to defend or indemnify an insured when there is no possibility of coverage under the applicable policy of insurance. However, the facts herein are very complex and it is not so clear that there is no possibility of coverage." *Lewis v. Ohio Edison Co.* (Jan. 9, 1991), Mahoning App. No. 89 CA 150, unreported, 1991 WL 1571.

The *Lewis* court thereafter declined to invalidate the parties' indemnification agreement or the conditional duty to pay damages under the liability insurance policy, and the Ohio Supreme Court denied further review. *Lewis v. Ohio Edison Co.* (1991), 61 Ohio St.3d 1412, 574 N.E.2d 1076.

These are standard principles governing the duty to defend determined by summary judgment in insurance coverage declaratory judgment actions. The allegations and liability coverage provisions do not unambiguously show there was no coverage. Under the circumstances, the two successive trial judges did not err by finding a duty to defend.

*Settlement*

Finally, we reject Commercial Union's argument that it is not liable to pay for its $1.3 million settlement for similar reasons. Commercial Union had the exclusive contractual right to decide whether to settle the tort claims. Nevertheless, it seeks to challenge its own settlement on the grounds that its own contract

violated public policy. Under the circumstances, the record does not show that the settlement was not lawfully covered by its liability insurance contract.

 In granting summary judgment, the trial court held that Commercial Union had a duty to defend and was conditionally liable for any judgment depending on the verdict and evidence presented at trial. The duty to defend a claim is distinct from the duty to pay that claim and does not mean that the insurer has a duty to pay if the facts subsequently show there is no coverage or liability of its insured.

Instead of proceeding to the scheduled bench trial, when the matter could be determined once and for all, however, Commercial Union exercised its exclusive contractual right to control and settle the litigation on the eve of trial without proof of the workers' claims or damages against any of the parties. Under the circumstances, after thoroughly reviewing the record, we find that (1) Commercial Union did not satisfy its burden of proving its affirmative defense that its insurance contract violated public policy and (2) the record does not show that its settlement was outside the scope of its liability insurance coverage or improperly covered injury or damages proximately caused by actionable negligence of Cleveland.

## Conclusion

As noted above, by failing to raise in its denial of coverage letter and to plead its affirmative defense of illegality concerning its own contract as required by Civ.R. 8(C), Commercial Union waived the claim. If Commercial Union believed the claims were not covered, it should have litigated them to judgment before the trial judge rather than voluntarily settling them on the eve of trial. *Ins. Co. of N. Am. v. Travelers Ins. Co.* (1997), 118 Ohio App.3d 302, 692 N.E.2d 1028, held an insurer liable for its own settlement despite the fact that the settlement involved claims of an additional insured's own negligence on a construction site. See, also, *Nationwide Ins. Co. v. Harvey* (1976), 50 Ohio App.2d 361, 364, 4 O.O.3d 315, 317, 363 N.E.2d 596, 598; *Taylor v. Am. Economy Ins. Co.* (June 24, 1987), Summit App. No. 12753, unreported, at 2, 1987 WL 13653. Even if failing to properly raise this defense and authorizing settlement of the claims did not preclude review of its coverage arguments as these cases suggest, Commercial Union has not shown the trial court improperly construed or applied its liability insurance contract.

Commercial Union has not shown that public policy precludes either liability on its settlement or liability insurance coverage in the case at bar. As noted above, the public works contracts were authorized by the Ohio Constitution, the Cleveland Charter, the Ohio Revised Code, and Cleveland ordinances. R.C. 2305.31 does not prohibit liability insurance coverage for this public works bridge project. Public liability insurance coverage was a prerequisite. C.C.O. 185.26. R.C.

2744.08(A)(1) expressly permits Cleveland to "secure insurance * * * [to cover] its * * * potential liability in damages * * * for injury * * * allegedly caused by an act or omission of the political subdivision or any of its employees." Construing R.C. 2744.08(A)(1) *in pari materia* with R.C. 2305.31 renders the public liability insurance lawful in the case at bar.

Even if the trial court construed the additional insured endorsement to cover Cleveland's own negligence as Commercial Union argues, it has shown no error. Public policy does not prohibit a public agency from obtaining liability insurance to protect the public on public works projects. Ohio courts have held insurers liable for settlements when they raise unfounded public policy arguments to avoid coverage, for example, in cases involving employers liability endorsements covering intentional torts as the case at bar. *E.g., Presrite Corp. v. Commercial Union Ins. Co.* (1996), 113 Ohio App.3d 38, 680 N.E.2d 216; *Baker v. Aetna Cas. & Sur. Co.* (1995), 107 Ohio App.3d 835, 669 N.E.2d 553; *Ward v. Custom Glass & Frame, Inc.* (1995), 105 Ohio App.3d 131, 663 N.E.2d 734.

Finally, even if Commercial Union were correct that coverage of liability for negligence by Cleveland were against public policy, it has not shown that the trial court applied its insurance contract to cover damages proximately caused by actionable negligence of Cleveland. The injured workers did not prosecute their claims or damages against Cleveland or the other parties. They dismissed their complaint against Cleveland without any finding or stipulation of liability or negligence by Cleveland. It is not clear who, if anyone, was liable or negligent or who proximately caused any injury or damage they may have suffered. The settlement relieved them of their burden of proving negligence, proximate cause, and damages concerning any party. Construction Supplies alleged negligence by ICC and ultimately recovered for damage to its crane. By agreeing to pay the workers to dismiss their complaint without proof, Commercial Union prevented any finding against its named insured, ICC, which would have triggered coverage under the policy.[19]

The settlement also compromised without adjudication all Cleveland's defenses, including (1) that Cleveland was protected by sovereign immunity for emergency bridge repairs, upon which the City prevailed by summary judgment before the first trial judge; (2) that ICC committed an intentional tort and proximately caused the employees' injury, as found to support the VSSR award; (3) that the crane manufacturer and/or lessor's conduct in providing an uninsulated crane without adequate warning was tortious and proximately caused any injury; and

---

**19.** Even if no judgment were entered against Cleveland, such a finding would establish Commercial Union's duty to defend Cleveland because the claims arose out of "ICC's work" and ICC's own tortious conduct.

(4) that Cleveland was not negligent and did not proximately cause any injury or damages.

By settling without proceeding to the bench trial, Commercial Union seeks to enhance its opportunity to contest coverage without regard to the facts of the underlying case supporting either the claims or defenses. Nothing in *Zavarella* supports this conclusion. The unique facts of *Zavarella* revealed to a legal certainty that no recovery could be made under the liability policy. Because the injured employee had exhausted (and lost) all his legal claims against his employer (the subcontractor and named insured) and because no other party raised tort claims against it, no further liability could "arise from its work" within the meaning of the endorsement. As a result, the only possible liability that could arise in the case was against the general contractor (the additional insured) for its own negligence.

As noted above, the case at bar is readily distinguishable. The workers did not exhaust (or lose) their claims against ICC, their employer and the named insured, and other claims were pending against it. Moreover, Cleveland raised defenses of sovereign immunity, ICC's VSSR violation, and the responsibility of other parties, which were not involved in *Zavarella*. Unlike in *Zavarella*, because legal recourse against ICC existed and the additional insured's defenses were supported, we cannot say as a matter of law that any liability did not "arise out of ICC's work." To the contrary, ICC was already found to have violated several specific safety requirements by operating the crane boom within two to three feet of overhead electrical wires in violation of published regulations. And that violation was also found to have been the proximate cause of Stickovich's injury. *State ex rel. Newman v. Industrial Comm., supra.*

Commercial Union has not shown that the trial court improperly applied the additional-insured endorsement to cover Cleveland for its own negligence in violation of R.C. 2305.31 as argued in its assignment of error. The claims arose out of, that is, "flowed from" or "had its origin in," ICC's work, including the selection, staffing, location, and operation of the crane, which were within its exclusive contractual control. Cleveland contracted for a finished product, namely, replacement of the bridge, and did not control the equipment, manner, or methods used by ICC to conduct the work, and there has never been any allegation that it did.

ICC selected the crane and located it on the site. The record unambiguously shows that ICC never requested Cleveland do anything to the electrical wires thereafter. ICC moved the crane when no one from Cleveland was on site, and did not request any change to the wires after it decided to operate the crane near them. ICC thereafter directed its unlicensed crane operator, who had been drinking alcohol at lunch, to operate it in violation of safety regulations. There is

no evidence that Cleveland had knowledge of this situation, let alone participated in it. In short, the allegations of Cleveland's "own" negligence were essentially its failure to prevent the negligence of others.

Unlike Commercial Union, we cannot assume that the trial court construed the insurance contract to cover actionable negligence of Cleveland. Cleveland argued it was immune from claims of liability arising from its own conduct under R.C. Chapter 2744 because the case involved discretionary acts in carrying out the governmental function of bridge repair to which no exception applied. Regardless of any immunity, however, there is existing caselaw involving claims by employees of independent contractors against both public and private property owners and utilities that would have supported its nonliability on the claims against it under the circumstances of this case. See *Betzner v. Navistar Int'l Transp.* (1991), 77 Ohio App.3d 611, 603 N.E.2d 256 (premises liability); *Id.*, *Brauning v. Cincinnati Gas & Elec.* (1989), 54 Ohio App.3d 38, 44–45, 560 N.E.2d 811, 817–818 (safe place to work); and *Joseph v. Ohio Power Co.* (1988), 46 Ohio App.3d 170, 546 N.E.2d 970 (as a utility). Under the circumstances, we find that Commercial Union failed to satisfy its burden of showing that liability insurance coverage was against public policy or that the trial court improperly applied its contract in the case at bar.

Accordingly, Commercial Union's sole assignment of error is overruled.

*Judgment affirmed.*

TIMOTHY E. MCMONAGLE, J., concurs.

MICHAEL J. CORRIGAN, J., dissents.

MICHAEL J. CORRIGAN, Judge, dissenting.

The holding of the majority opinion is very narrow: Commercial Union waived the right to assert the affirmative defense of illegality because it did not raise the defense in its answer to the city's third-party complaint.

I disagree with this conclusion, being of the opinion that R.C. 2305.31 and *Buckeye Union Ins. Co. v. Zavarella Brothers Constr. Co.* (1997), 121 Ohio App.3d 147, 699 N.E.2d 127, would render the contract void *ab initio*, and that we should not apply the waiver rule to give vitality to an otherwise void contract. Obviously, I also disagree with all of the majority opinion beyond the section entitled "Waiver". I am compelled to point out that the majority's discussion is *dicta* in its purest form, being wholly unnecessary to the very narrow point of law—the waiver issue—that forms the basis for the majority's resolution of the case.